UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

KELLY L. SACKETT,

                              Plaintiff,

        v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

                              Defendant.

Case No.  2:17-CV-00223-GWF

**ORDER**

**Re:  Motion for Reversal and/or Remand
(ECF No. 12)**

        This case involves judicial review of an administrative action by the Commissioner of

Social Security denying Plaintiff Kelly L. Sackett's claim for disability benefits under Title II of

the Social Security Act.  The parties have consented to have the undersigned United States

Magistrate Judge conduct all proceedings in this case, including entry of final judgment,

pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  *See* ECF

No. 16.  This matter is before the Court on Plaintiff's Motion for Reversal and/or Remand (ECF

No. 12), filed on May 22, 2017, and Defendant's Cross-Motion to Affirm and Response to

Plaintiff's Motion for Reversal and/or Remand (ECF No. 17), filed on July 20, 2017.  Plaintiff

filed her Reply (ECF No. 19) on July 31, 2017.

## BACKGROUND

### A.  Procedural History and Factual Background.

        Plaintiff filed a Title II application for a period of disability and disability insurance

benefits on July 7, 2014, alleging that her disability began on March 1, 2014.   Administrative

Record ("AR") 62-73.  The Social Security Administration denied Plaintiff's claim initially on

November 4, 2014 as well as her request for reconsideration on June 1, 2015.  AR 91-95, 102-

106.  She requested a hearing before an Administrative Law Judge ("ALJ") which was

conducted on June 29, 2016.  AR 107, 136.  The ALJ determined that Plaintiff was not disabled

from March 1, 2014 through September 29, 2016, the date of the ALJ's decision. AR. 21.  The

Appeals Council denied her request for review on December 8, 2016.  AR 1-7.  Plaintiff then

commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).

### 1. Disability/Work History Reports

Plaintiff Kelly Sackett was born on November 30, 1967.  She is 5'5" tall and weighed

102 pounds as of her July 7, 2014 application.  AR 160-163.  She completed two years of

college.  AR 164.  Plaintiff is married and her husband is a quadriplegic.  She has three children.

Two of her children are twins, who were seventeen years old and lived with Plaintiff at the time

of the June 29, 2016 hearing.  AR 42, 121.  Plaintiff worked in retail sales for AT&T from July

1991 to March 2006.  Thereafter, she worked as a controller and office manager for a

construction company from March 2006 to March 2014.  AR 164.  Plaintiff has been

unemployed since March 2014.  In her July 8, 2014 disability report, Plaintiff listed the

following conditions that limit her ability to work: degenerative disk disease at L4-5,

endometriosis, abnormal marrow, and cognitive counseling from former employer abuse.  AR

163.

Plaintiff completed a function report on August 9, 2014 which stated that she cannot sit,

stand or lift for "any length of time" due to extreme pain in her back, hips, and leg.  AR 188.

She could not sit or stand for more than 30 minutes and needed to lie down several times a day.

She did not have any problem performing personal care, but stated that it took her longer because

of pain.  She was usually exhausted by the end of the day and occasionally had a sleepless night.

Prior to the onset of her disabling pain, she was physically active, and was able to exercise,

dance, lift and run.  AR 189.

Plaintiff stated that she prepared simple meals that took about 10 minutes to make.  Her

husband usually prepared dinner.  She also performed routine chores such as cleaning the house

and doing laundry.  Her family assisted by taking out the trash, vacuuming, mopping, and

changing light bulbs.  It now took her a week to complete chores that she was previously able to

do in a day.  AR 190.  Plaintiff shopped for groceries once a week.  She would only purchase a

2

few items unless she had someone to assist with lifting heavy items, pushing the shopping cart, and loading and unloading the items in the car. She was able to pay bills, count change, handle a savings account, and use a checkbook. She read and watched television daily. For social activities, she talked to friends and family over the phone regularly. She stopped going to the movies, parties or sporting events after her severe pain began. Plaintiff attended medical appointments a few times a month. Her sister or niece accompanied her. AR 191-92.

Plaintiff's pain affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks. These activities were painful, especially if done repetitiously or for a lengthy period of time. She used a device to pick up items that were on the ground or out of her reach. She was able to comprehend written and spoken instructions, and could handle stress and changes in routine. AR 193-94. Plaintiff stated that she began experiencing severe back spasms in September 2013. This made it extremely difficult to perform her job which required many hours of sitting. AR 195.

Plaintiff's sister, Dawn Wengert, completed a third-party function report on August 15, 2014. Ms. Wengert stated that she spent approximately 20 hours per week with Plaintiff. She stated that Plaintiff was unable to sit "for any period of time without extreme pain," and standing was also painful. Plaintiff was unable to perform simple household tasks and was limited in performing personal care tasks. Plaintiff's children helped her, but they needed guidance. Ms. Wengert stated that Plaintiff was able to drive with difficulty. She had to lie down for extended periods to rest. Ms. Wengert accompanied Plaintiff to her doctor appointments if her pain was bad. AR 196-203.

**2.      Hearing Testimony**

Plaintiff testified at the June 29, 2016 hearing that she was unable to work due to her degenerative disk disease. AR 37-41. She denied having any disability due to mental impairments. Her osteomyelitis, a bone infection, was not active. She indicated that she was unable to have lumbar fusion surgery because she was allergic to the titanium that would be in the implant hardware. She saw her primary care doctor, Dr. Lana Dawood, approximately every three months. Dr. Dawood prescribed Ibuprofen, Acetominophen, Alprazolam, Levothyroxine,

and Gabapentin to control her back pain and radiating symptoms. AR 41. The Acetaminophen (Tylenol with codeine) made her drowsy. She could not drive or work while taking it. AR 42.

Plaintiff lived with her husband and two daughters. Her daughters helped her get dressed, prepared meals, and did laundry and shopping. Plaintiff would wash dishes, but it took her a long time to do so. Her daily activities included driving her daughters to and from school, organizing her home office, and using her iPad for internet activities two to three hours per day. She also swam in her home pool. She was trying to get into hobbies. Other family members visited her about twice a week and helped with household chores. AR 42-47. Plaintiff testified that she could walk about 200 feet before having to stop and sit. She did not walk very much, however, because of her pain. She could stand for about 20 minutes before having to sit. She could sit in a chair for ten minutes before having to shift positions, but could sit for two hours. She went to physical therapy, but it was not helpful and actually caused her more pain. AR 47-51.

Plaintiff testified that she felt a burning, shooting pain and experienced throbbing and spasms in her back. She had a constant shooting pain down her legs. She was not in a pain management program but had received three cortisone injections. She had problems with her balance due to plantar fasciitis in her right foot, and she had fallen. She estimated that she had fallen six times in the past year. Her legs also gave out on her on two occasions. She had great difficulty using stairs. Plaintiff used a cane prescribed by Dr. Dawood to get up from a seated position, and in the morning when she was most stiff and unable to keep her balance. She estimated that she spent two hours a day lying down. AR 51-57.

### 3. Vocational Expert Testimony

The vocational expert testified that Plaintiff's past combined work as a controller/administrative assistant was sedentary work with an SVP of 8 for the controller position and an SVP of 7 for the administrative assistant position. She classified Plaintiff's past work as a telephone sales representative as light work with an SVP of 7. AR 58-59.

The ALJ asked the vocational expert to assume a hypothetical individual with the same vocational factors as Plaintiff, and with the following functional limitations: lifting and/or

carrying 20 pounds occasionally and 10 pounds frequently;  standing and/or walking with normal breaks for no more than two hours in the course of an eight hour work day; and sitting with normal breaks for about six hours in the course of an eight hour work day.  The hypothetical individual would have to periodically alternate between sitting and standing to relieve pain and discomfort;  could occasionally climb ramps and/or stairs, but never climb ladders, ropes and/or scaffolds; could frequently balance; could occasionally stoop, kneel, crouch, and crawl; and had to avoid concentrated exposure to extreme cold, vibrations; and hazards including unprotected heights and dangerous machinery.  The vocational expert testified that an individual with these limitations would be able to perform Plaintiff's past hybrid work position as a controller/administrative assistant.  AR 59-60.

The ALJ then asked the vocational expert to assume that the hypothetical individual was limited to sitting, standing, or walking for less than 2 hours in an 8 hour day, and could rarely lift as much as 10 pounds.  He asked whether there were any jobs in the national economy that a person with such limitations could perform.  The vocational expert stated that there were none.  AR 60.  Plaintiff's counsel asked whether the hypothetical individual could perform Plaintiff's past work if the she was required take a one hour long break outside of the traditional breaks.  The vocational expert stated that the individual would not be able to perform those jobs with this additional limitation.  AR 61.

### 4.    Medical Records

An  MRI of Plaintiff's lumbar spine was performed on November 4, 2011.  The report indicated a history of low back pain with left radiculopathy following an injury.  AR 259.  There was no posterior disk bulge or herniation.  There was partial disk dehydration at L2-3, L3-4, and L4-5.  AR 260.

Plaintiff saw Matthew Otten, D.O., at Advanced Orthopedics and Sports Medicine, for left hip pain on November 16, 2012, "15 months after a left buttock injury."  She had received an SI injection that did not provide relief.  She also received formal physical therapy.  AR 605.  Dr. Otten's impression was a "focal tear of the semimembranosus tendon at the ischial tuberosity."  He prescribed a cortisone injection and physical therapy.  AR 606.  Dr. Otten noted on December

21, 2012 that the cortisone injection had not relieved Plaintiff's pain and that she was now having mild sacroiliitis secondary to mechanical gait changes. He recommended a series of PRP injections and continued physical therapy. AR 600-601. Plaintiff received the PRP injections on January 11, 18, and 25, 2013. AR 284-293. Dr. Otten reported on March 19, 2013 that Plaintiff was now having "mild gluteus medius piriformis pain," but that she had improved overall. AR 277. She had full joint strength in all planes of motion including flexion, extension, abduction, and adduction. There was no significant pain with internal and external rotation passively at 90 degrees. Plaintiff's gait was normal. Dr. Otten stated that he would obtain an MRI for further evaluation. AR 278.

On March 20, 2013,Tru Physical Therapy notified Dr. Otten that Plaintiff had been discharged from therapy. Several attempts had been made to contact her for scheduling, but no reply was received. AR 270.

Plaintiff saw James Meli, D.O. at Diagnostic Center of Medicine ("DCOM"), on February 27, 2014 for "an ADHD medicine check," renewal of prescriptions, and a review of her lumbar spine x-ray taken on January 28, 2014. She reported low back pain, but no joint pain, claudication, muscle cramps or muscle weakness. Physical examination of the musculoskeletal system was reported as normal with no tenderness, swelling and normal range of motion. AR 358. An MRI of the lumbar spine was ordered and Plaintiff was to be given a referral to see a back surgeon. AR 357-359. Dr. Meli's March 28, 2014 office visit note made no specific reference to low back pain, and physical examination of the lumbosacral spine indicated no tenderness to palpation, no pain, no swelling, edema, or erythema of surrounding tissue and normal lumbosacral spine movements. Dr. Meli, however, provided osteopathic manipulation. AR 354-356. Plaintiff returned on May 1, 2014 to discuss her back pain. There were no specific findings of low pain or tenderness, but osteopathic manipulation was again provided. AR 351-353. On May 28, 2014, Plaintiff requested a trigger point injection due to back pain and muscle spasms— which was given. AR 347-350.

Plaintiff returned to Dr. Otten on June 3, 2014 for evaluation of mid back pain that began in September 2013. She denied any radicular symptoms. "The pain was exquisite to the extent

that she [could not] find a comfortable position." Plaintiff was in no acute distress and had a

normal gait. On physical examination, there was mild tenderness upon deep palpation over the

lumber spine. She had mild pain with active flexion and extension at the apices. Rotational

range of motion of the lumbar spine elicited mild pain, and she had slightly decreased range of

motion of her lumbar spine with flexion, extension, rotation and lateral side bending secondary

to moderate to mild pain. Dr. Otten stated that imaging showed profound bone loss at L3-4 and

total loss of disc height. His impression was (1) low back pain and (2) disc collapse at L3-4,

with consideration of boney remodeling secondary to possible metastatic cancer. He

recommended obtaining a STAT MRI and prescribed pain medication. AR 275-276. An MRI

was obtained that same day which showed extensive loss of disc height with endplate irregularity

and minimal broad-based disc bulge, but no focal disc protrusion at L4-5. AR 268-269.

Plaintiff saw Dr. Sep Bady for an orthopedic consultation on June 9, 2014. He noted a

two year history of low back pain "which is almost all of the back with some buttock pain." The

pain was constant. On physical examination, Dr. Bady noted mild soft tissue pain on palpation.

On range of motion, flexion was to 40 degrees and painful; extension was to 20 degrees and

painful. Rotation was limited secondary to pain; lateral bending to 20 degrees was painful.

There was full rotation of hips without pain. Special tests of the right and left legs were normal

and her muscle strength on right and left was normal. AR 271. Dr. Bady reviewed the MRI film

and concluded that the disc disease was at L3-4. He informed Plaintiff that the causes of this

condition could include multiple myeloma or other issues and recommended that several

diagnostic tests be conducted. AR 272.

Plaintiff returned to DCOM on July 1, 2014, for a follow-up on lab results and to discuss

the MRI of her lumbar spine. She reported that she would be undergoing a total hysterectomy

the next week. She continued to suffer from chronic low back pain that radiated down her left

leg. AR 340-342. Plaintiff underwent the hysterectomy on July 16, 2014. AR 376, 617.

Plaintiff was seen in follow-up at DCOM on July 31, 2014, and reported that no cancer was

found during the surgery. AR 335-337. Her last progress note with DCOM on September 29,

2014 indicated that she needed a referral for a biopsy of L-3. AR 328.

Plaintiff saw Dr. Bady on September 18, 2014.  He noted that she continued to have severe back pain and had a significant nickel allergy.  AR 296.  He reviewed her recent CAT scan, bone scan and MRI.  The bone scan did not show signs of infection.  The CAT scan and MRI showed a possible old osteomyelitis and discitis versus severe degenerative disc disease.  The L3-4 level was severely degenerated with significant osteophyte formation.  Dr. Bady advised Plaintiff that it was still a good idea to obtain a biopsy to see whether the lumbar spine area was infected. He also advised her to see an allergist regarding her metal allergy because surgery implants contain titanium and other metals.  AR 296.

Plaintiff saw Andrew Cash, M.D., at Desert Institute of Spine Care on September 24, 2014 for a second opinion.  Plaintiff stated in her questionnaire answers that she developed an infection and severe back and leg pain as a result of an implanted birth control device.  She also stated that "[a]fter resigning from my job for other reasons, I decided to take care of my health."  She had extreme back spasms every morning, and listed her average pain level as an 8.  The worst pain level was between 9 and 10.  AR 311-312.  Plaintiff told Dr. Cash that her radicular symptoms and muscle spasms in her lower extremities had now resolved.  On physical examination, there was bilateral paraspinal musculature spasms, pain, and tenderness.  Muscle strength was 5/5 bilaterally.  Deep tendon reflexes were symmetrical and light touch sensation was intact.  The hip and sacroiliac joint exams were unremarkable.  X-rays, MRI, and CT scan were consistent with lumbar discitis at L3-4.  Dr. Cash recommended that Plaintiff have antibiotics and undergo a CT biopsy.  AR 326-327.

A CT guided L4 biopsy was performed on October 4, 2014.  It showed no tumor cells, and no significant acute inflammation was identified.  Part of the biopsy sample was sent for cultures, but the integrity of the sample was compromised and culture studies could not be performed.  AR 426-427.

Plaintiff saw Lana Dawood, M.D. on November 20, 2014 to establish care.  She reported chronic back pain with a pain level of 8.  Dr. Dawood's physical examination findings stated that there was intact range of motion in the extremities, but decreased range of motion in the spine.  There was no joint erythema or tenderness.  Muscular development was normal, and Plaintiff had

a normal gait.  Dr. Dawood prescribed pain medication and stated that Plaintiff would be given

referrals for an infectious disease evaluation for possible L3-4 osteomyelitis, and an orthopedic

surgery evaluation.  Plaintiff was advised to return in 3 months.  AR 478-485.

Plaintiff saw Dr. Derek Duke at the Spine and Brain Institute for a lumbar evaluation on

February 4, 2015.  She reported pain in the small of her back with some symptoms in the leg.

Dr. Duke recommended further testing.  AR 535-536.  Another MRI of Plaintiff's lumbar spine

was performed on February 10, 2015.  It showed:

> Multilevel degenerative disc disease, disc dehydration.  At L3-4 there is
> marked disc space narrowing and irregularity of the endplates.  Do not see any
> significant edema in the adjacent vertebral bodies or within the disc space, no
> bright signal on T2.  Cannot entirely exclude chronic discitis but would be
> considered quiescent at this time.  Also no significant change or worsening
> from previous.  No discrete pars defect.  No spondylolisthesis.  The bone
> marrow signal is normal.  Spinal cord signal appears normal.  The clonus
> medullaris is normal in position.  The visualized aorta is normal in caliber.
> The paraspinal soft tissues appear normal.  AR 510.

The radiologist's impressions were (1) advanced degenerative disc space narrowing at

L3-4, but no marrow edema or disc space signal to suggest an active process; (2) no definite

neural impingement; and (3) multilevel moderate foraminal stenosis, most impressive at L4-5.

AR 510-511.

Plaintiff returned to Dr. Dawood on February 17, 2015, complaining of back pain and

reported a pain level of 7.  She stated that she had been seen by the infectious disease doctor and

orthopedic doctor, and both agreed that she should have PICC line and start long term Abx (an

intravenous line to provide antibiotic medicine).  AR 463.  Plaintiff appeared to be in no acute

distress.  Her spine was adequately aligned, there was normal muscular development, and she

had a normal gait.  AR 464.  Plaintiff was continued on her pain and attention deficit disorder

medications.  AR 465-466.

Dr. Duke saw Plaintiff on February 20, 2015, and noted that overall, she was making

progress.  AR 532.  Her "labs came back looking really quite good.  The updated MRI

demonstrates further resolution of the osteomyelitis/diskitis at L3-4."  AR 534.  Dr. Duke stated

that no further evaluation from a neurosurgical standpoint was warranted.  He prescribed physical therapy and instructed Plaintiff to follow-up as needed.  AR 534.

Plaintiff saw Dr. Brian Lipman of Infectious Diseases of Southern Nevada, on March 18, 2015.  He stated that based on the February 4, 2015 MRI and the normal lab results for CBC, ESR, and CRP, that there was no need for antibiotic therapy.  He recommended that Plaintiff proceed with physical therapy.  Dr. Lipman declined Plaintiff's request for a note stating that she was disabled, "as there is no evidence from my point of view that the patient has any disability related to an infectious disease issue." AR 551.

Thomas Chu, PA-C, performed an allergy patch test on Plaintiff on May 5, 2015.  AR 506.  It was determined that Plaintiff has a contact allergy to nickel sulfate, cobalt dichloride, and titanium.  He recommended that Plaintiff avoid those metals/compounds and any products that might contain them.

Plaintiff saw Dr. Dawood on May 20, 2015, who noted that Plaintiff reported continuous back pain and left leg pain and numbness that made her depressed and "low function." AR 561.  Plaintiff did not appear to be in acute distress.  AR 564.

Plaintiff saw Dr. Duke on July 10, 2015, and reported that she was having persistent back pain and was concerned that the symptoms may be progressing.  She reported having some pain in the left leg.  AR 528.  Dr. Duke requested a further MRI to evaluate.  AR 529.  An August 11, 2015 MRI also showed advanced degenerative changes at L3-4 with severe disc space narrowing and endplate irregularity.  There was no significant fluid collection or phlegmon formation and there was no short-TI inversion recovery ("STIR") signal to suggest an acute process.  There was no evidence of spinal canal narrowing or neuroforaminal narrowing.  AR 508.

Plaintiff began physical therapy with Tru Physical Therapy on March 11, 2015.  She reported that her osteomyelitis was dormant.  She had numbness along her left thigh.  Her pain level was at a 7.5 out of 10 while resting, and a 9 out of 10 with activity.  She had increased swelling along the lumbar spine.  Plaintiff demonstrated decreased trunk range of motion and difficulty tolerating manual muscle tests due to weakness and pain.  AR 587.  The therapist noted on March 13, 2015 that Plaintiff tolerated all exercises well and denied any complaints of pain.

She demonstrated poor abdominal control. AR 585. On March 17, 2015, she had difficulty tolerating new exercises and had hip weakness. AR 584. On March 20, 2015, Plaintiff reported that she was very sore after the last session and had difficulty tolerating the exercises. ARE 583. On March 24, she reported that her back was still very sore. AR 582. On March 26, 2015, Plaintiff reported that she felt a little better and she tolerated all exercises well without complaints of pain. She demonstrated improved abdominal control during exercise. AR 581.

On April 2, 2015, Plaintiff reported some left hamstring pain, but tolerated all exercises and new stretches well, without complaints of pain. AR 580. On April 7, 2015, she reported still feeling sore some of the time, but tolerated all exercises well and had decreased pain. On April 9, 2015, she reported feeling better since the last session, and tolerated all exercises well. She demonstrated improved trunk active range of motion ("AROM"). AR 578. On May 14, 2015, Plaintiff reported that her pain had been "around a 9/10 lately." She tolerated all exercises well without complaints of pain. She had decreased pain in all of her extremities. AR 577. On May 19, 2015, she stated that she was sore after the last session. She tolerated all exercises well and had decreased pain in all extremities. AR 576. On May 26, 2015, she stated that she was a little sore. She complaint of some discomfort during exercises, but felt better with therapy. AR 575.

On June 11, 2015, Plaintiff stated that she was having a lot of pain since missing therapy. She performed all exercises well without complaints of pain. She demonstrated fair control of maintaining pelvic neutral. AR 574. On June 25, 2015, she again stated she was sore from missing therapy. She tolerated all exercises well without complaints of pain. AR 573. On July 9, 2015, Plaintiff reported that she had "been very sore and inflamed lately." She tolerated all exercises well, but complained of mild low back discomfort. She had decreased pain in all extremities. AR 572. On July 14, 2015, Plaintiff reported that she was able to get a good night's sleep. She tolerated all exercises well without any complaints of pain. She had decreased pain in all of her extremities. AR 571. The therapist's records indicate that Plaintiff did not appear for appointments in the remainder of July 2015, and she was formally discharged for that reason on October 28, 2015. AR 591.

1     Plaintiff saw Dr. Duke on October 12, 2015.  He referred her to a rheumatologist for

2   evaluation and to a primary care physician for pain management.  AR 524-525.  Plaintiff testified

3   that she did not see a rheumatologist because a referral was required from her primary physician,

4   Dr. Dawood.  Dr. Dawood did not give her a referral because the blood work was negative for

5   rheumatoid arthritis.  AR 38-40.

6     Kathleen Dale Smith, M.D., performed a medical evaluation of Plaintiff on April 8 and 9,

7   2014.  Dr. Smith noted that Plaintiff's chief complaints were low back pain and neck pain, and

8   that her back pain was worse.  Plaintiff denied numbness, tingling, or other radiculopathy.  AR

9   678.  Plaintiff had shooting, spasmodic, and burning pain.  AR 679.  She had muscle tension and

10  muscle spasm on both sides of her thoracic spine.  Her range of motion was within normal limits

11  for her thoracic spine, but moderately reduced with pain in the lumbar spine.  Bechterew's sitting

12  tests were negative on both sides.  Plaintiff had pain when her left leg was lifted during the

13  straight leg raising test.  AR 689.  Dr. Smith found that Plaintiff should avoid over exertion in the

14  form of pushing, pulling, lifting, stooping, reaching, bending, prolonged standing, walking, and

15  sitting.  AR 690.

16    State agency physician, Nalina Tella, MD., performed a residual functional capacity

17  assessment on May 30, 2015.  Based on her review of the records, Dr. Tella opined that Plaintiff

18  had mild degenerative disc disease and loss of disc height.  Examinations showed normal gait,

19  normal spinous process, and only mild soft tissue pain to palpation.  Dr. Tella found that Plaintiff

20  could occasionally lift and/or carry 20 pounds, could frequently lift and/or carry 10 pounds.  She

21  could stand and/or walk with normal breaks for a total of two hours and sit for a total of six hours

22  in an eight hour workday.  Plaintiff could occasionally climb ramps and stairs, and occasionally

23  kneel, crouch and crawl.  She was capable of frequent balancing, but could never climb ladders

24  ropes or scaffolds.  Plaintiff did not have any manipulative, visual, or communicative limitations.

25  AR 85.  Environmentally, she should avoid concentrated exposure to extreme cold, vibration,

26  and hazards such as machinery and heights.  AR 86.  Dr. Tella noted that Plaintiff "was not seen

27  by pain management specialist are [sic] orthopedist since 6/14.  The recent physical exam dated

28  2/15 does not document significant physical findings."  AR 86.  She found that Plaintiff's

condition "results in some limitations in [her] ability to perform work related activities. However, these limitations do not prevent [her] from performing work [she has] done in the past as a Controller/Office Manager, as normally performed in the national economy." AR 88.

Dr. Dawood completed a treating physician questionnaire on April 26, 2016. She listed Plaintiff's symptoms as back pain, limited range of motion, and gait instability. Her back pain worsened with movement and long standing. Plaintiff was not a malingerer. AR 593. Dr. Dawood stated that Plaintiff was incapable of even "low stress" jobs because she was unable to sit or stand for a long period of time and was using medication to control anxiety and attention deficit disorder. Plaintiff's symptoms were severe enough to constantly interfere with her attention and concentration. She had a 60% loss of range of motion in the lower back and experienced frequent muscle spasm. Plaintiff would need a job that permitted shifting of position at will and unscheduled breaks during an 8 hour work day. She also needed the assistance of a cane or other walking device. AR 594. Plaintiff was unable to squat, walk on her toes and heels, and could sit or stand/walk for less than 2 hours in an 8 hour work day. Plaintiff could rarely lift less than 10 pounds and never lift anything of greater weight. AR 595.

### 4. ALJ's Decision

The ALJ applied the five-step sequential evaluation process established by the Social Security Administration, 20 CFR 416.920(a), to determine whether Plaintiff was disabled. At step one, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2019 and that she has not engaged in substantial gainful activity since March 1, 2014, her alleged disability onset date. AR 16.

At step two, the ALJ found that Plaintiff's degenerative disc disease of the lumbar spine was a severe impairment. Her osteomyelitis and endometriosis were not severe impairments because the record did not establish that they significantly limited her ability to perform basic work activities. The ALJ noted that Plaintiff testified that her osteomyelitis was resolved. After summarizing the MRI and CT scan studies, the ALJ noted that Dr. Duke reported on February 20, 2015 that there was further resolution of her osteomyelitis/discitis at L3-4. Dr. Lipman found no evidence of osteomyelitis on March 18, 2015 and declined to provide Plaintiff with a

disability note because she did not have a disability related to infectious disease.   Plaintiff had a hysterectomy in July 2014 and there was no objective evidence that endometriosis was a current impairment.  There was also insufficient evidence to support a finding of a mental impairment. AR 17-18.  At step three, the ALJ found that Plaintiff's impairment did not meet or was not the medical equivalent to any listed impairment in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR § 404.1520(d), § 404.1525 and § 404.1526).  AR 18.

Prior to step four, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b), except that she could lift and/or carry twenty pounds occasionally and ten pounds frequently.  She could stand and/or walk, with normal breaks, for about two hours in an eight-hour workday.  She could sit, with normal breaks, for about six hours in an eight-hour workday.  She had to periodically alternate sitting and standing to relieve pain and discomfort.  Pushing and/or pulling was limited to the same extent as lifting and carrying.  She could occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds.  She could occasionally stoop, kneel, crouch, and crawl.  She could frequently balance.  She had to avoid concentrated exposure to extreme cold, vibration, and hazards such as unprotected heights and dangerous machinery.  AR 18.

In support of his RFC determination, the ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms, however, were not consistent with the medical evidence and other evidence in the record.  AR 19.  Although diagnostic studies of the lumbar spine showed severe degenerative disc disease, there was no suggestion of metastatic disease.  Plaintiff stated that physical therapy in 2015 was not helpful and caused more pain.  The physical therapist reported, however, that Plaintiff tolerated all exercises with no more than mild pain or discomfort.  Plaintiff was able to perform a limited range of daily activity including preparing ready-made meals and going to the grocery store with her daughters.  She could do dishes slowly and was able to drive.  She organized her home office and spent two to three hours online using her iPad.  She swam and visited with her family twice a week.  The ALJ stated that these activities suggested the capacity for at least sedentary activity as assessed by the

state agency medical consultant. The ALJ accorded little weight to the statement of Plaintiff's sister because it was also inconsistent with the medical and other record evidence. AR 19-20.

The ALJ gave great weight to the opinion of state agency physician, Nalina Tella, M.D., who reviewed the evidence at the reconsideration level and opined that Plaintiff was capable of a limited range of light work. Dr. Tella's opinion was supported by and consistent with the other record evidence submitted to the state agency. AR 20. The ALJ gave no weight to Dr. Dawood's "check-box form opinion" and her assessment that Plaintiff had a less than sedentary residual functional capacity. The ALJ stated that Dr. Dawood's assessment was brief, conclusory, with very few clinical findings to support her opinion. Her findings were inconsistent with other evidence in the record. Plaintiff's osteomyelitis had resolved. Dr. Dawood's opinion that Plaintiff had back pain, limited range of motion and gait instability was inconsistent with Plaintiff's response to physical therapy in 2015. It was also inconsistent with the most recent imaging and nonfocal neurologic findings reported by Dr. Lipman in 2015 and 2016. The ALJ also stated that Dr. Dawood findings that Plaintiff had an unstable gait and limped sometimes were not reported by any other medical source. Nor did the ALJ observe these abnormalities during Plaintiff's hearing. AR 20.

Based on his assessment of Plaintiff's residual functional capacity assessment and the vocational expert's testimony, the ALJ found that Plaintiff was capable of performing her past jobs of controller/administrative assistant and tele-sales representative. He therefore concluded that she had not been disabled at any time from March 1, 2014 through the date of his decision. AR 21.

## DISCUSSION

### I. Standard of Review

A federal court's review of an ALJ's decision is limited to determining (1) whether the ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper legal standards. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991). The Ninth Circuit has defined substantial evidence as more than a mere scintilla but less than a preponderance; it is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion. *Lewis v. Apfel*, 236 F.3d 503, 509 (9th Cir. 2001); *Trevizo v. Berryhill*, 871 F.3d 664, 674 (9th Cir. 2017). The Court must look to the record as a whole and consider both adverse and supporting evidence. *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993). Where the factual findings of the Commissioner of Social Security are supported by substantial evidence, the District Court must accept them as conclusive. 42 U.S.C. § 405(g). Hence, where the evidence may be open to more than one rational interpretation, the Court is required to uphold the decision. *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (quoting *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)); *see also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The court may not substitute its judgment for that of the ALJ if the evidence can reasonably support reversal or affirmation of the ALJ's decision. *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

It is incumbent on the ALJ to make specific findings so that the court need not speculate as to the findings. *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981) (citing *Baerga v. Richardson*, 500 F.2d 309 (3rd Cir. 1974)). In order to enable the court to properly determine whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings "should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based." *Lewin*, 654 F.2d at 635.

In reviewing the administrative decision, the court has the power to enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In the alternative, the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*

**II. Disability Evaluation Process**

To qualify for disability benefits under the Social Security Act, a claimant must show that: (a) he/she suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of

not less that twelve months; and (b) the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see also* 42 U.S.C. § 423(d)(2)(A). The claimant has the initial burden of proving disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996). If the claimant establishes an inability to perform her prior work, the burden shifts to the Commissioner to show that the claimant can perform a significant number of other jobs that exist in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007). Social Security disability claims are evaluated under a five-step sequential evaluation procedure. *See* 20 C.F.R. § 404.1520(a)-(f). *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). If a claimant is found to be disabled, or not disabled, at any point during the process, then no further assessment is necessary. 20 C.F.R. § 404.1520(a). The ALJ correctly set forth five steps in his decision, AR 15-16, and they will not be repeated here.

### III. Whether the ALJ Erred in Rejecting the Opinion of Plaintiff's Treating Physician.

Plaintiff argues that the ALJ failed to provide legally sufficient reasons for rejecting the opinions of her treating physician, Dr. Lana Dawood, and in affording great weight to the opinion of the reviewing state agency physician, Dr. Tella.

A treating physician's medical opinion on the nature and severity of a claimant's impairments is entitled to controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). Under the standards in effect when Plaintiff's claim was adjudicated, more weight should generally be given to the opinion of a treating physician than to those of examining or reviewing physicians; and the opinion of an examining physician is generally entitled to greater weight than that of a reviewing physician. *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) and *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)).

If a treating physician's opinion is contradicted by another doctor's opinion, the ALJ may

17

only reject it by providing specific and legitimate reasons that are supported by substantial evidence. *"This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight ... even if it does not meet the test for controlling weight.'"* *Garrison*, 759 F.3d at 1012 (quoting *Orne v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)). The weight to be accorded to a treating physician's opinion is determined by considering a number of relevant factors, including (1) the length of the treatment relationship, (2) the nature and extent of the treatment relationship, (3) the extent to which the treating physician provides evidence to support her opinion, (4) whether the medical opinion is consistent with the record as a whole, (5) whether the treating physician is a specialist providing a medical opinion on issues related to her area of specialty, and (6) other factors which may tend to support or contradict the medical opinion. 20 C.F.R. § 404.1527(c)(2). An ALJ's failure to apply the appropriate factors in determining the extent to which the treating physician's opinion should be credited is reversible error. *Trevizo*, 871 F.3d at 676.

The ALJ gave no weight to Dr. Dawood's "check-box form opinion" because her assessment was brief and conclusory, with very few clinical findings to support the opinion. He also found that her opinion was not consistent with other evidence, including the physical therapy records from 2015 which generally showed improvement. The ALJ stated that Dr. Dawood's opinion that Plaintiff had an unstable gait and limped sometimes was not supported by other medical sources, and was contrary to his observation of Plaintiff at the hearing.

Plaintiff cites *Garrison v. Colvin*, 795 F.3d at 1013, in arguing that the ALJ erred in criticizing Dr. Dawood's opinion as a "check-box form opinion." *Garrison* held that the ALJ failed to recognize that the opinions expressed in the treating physician's check box form "were based on significant experience with the claimant and supported by numerous records, and were therefore entitled to weight that an otherwise unsupported and unexplained check-box form would not merit." *Id.* The Commissioner counters by citing *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012), in which the court stated that a physician assistant's opinion as to the claimant's mental impairments "consisted primarily of a standardized, check-the-box form in which she failed to provide supporting reasoning or clinical findings, despite being instructed to

do so." The court stated that an ALJ may permissibly reject check-off reports that do not contain any explanation of the bases of their conclusions. The Commissioner also cites *Hart v. Astrue*, 349 Fed.Appx. 175, 178 (9th Cir. Oct. 20, 2009) (unpublished decision), in which the court held that the ALJ properly rejected a treating physician's opinion that was provided on a "checkbox that contained none of his rationale or explanation." The court noted, more importantly, that the doctor reported that the plaintiff's condition improved when taking the proper medications and that plaintiff had stopped going to her bipolar support group. *Id.* In this case, the ALJ referred to Dr. Dawood's "check-box form opinion," but he did not reject it solely on that basis.

Dr. Dawood's April 26, 2016 questionnaire responses provided some information regarding her opinions that were not entirely "check-box" answers. She stated that Plaintiff's diagnoses were back pain, disc collapse, diskitis, and possible osteomyelitis for which the prognosis was unknown. She listed Plaintiff's symptoms as lower back pain that radiated to the lower extremities and worsened with movement and long standing. Under clinical findings and objective signs, she listed MRI, physical exam, and point tenderness at lower back/lumbar. Under treatment and responses thereto, Dr. Dawood listed pain meds, follow-up with infectious disease, orthopedic and that Plaintiff had seen an allergist. AR 593. In checking the box that Plaintiff was incapable of even "low stress" jobs, Dr. Dawood explained that Plaintiff could not sit or stand for a long period of time, and that she was using medication to control anxiety and attention deficit disorder. She stated that Plaintiff had 60 percent loss of motion of the lower back; apparently experienced frequent muscle spasms in the lower back (60%), and rarely had spasms in the lower extremities (5%). She also reported that Plaintiff had an unstable gait and limped sometimes. AR 594.

Dr. Dawood stated that she had seen Plaintiff on November 20, 2014, February 17, 2015, May 20, 2015, September 24, 2015, December 18, 2015 and April 26, 2016 (the date of the questionnaire). The administrative record contains Dr. Dawood's office visit notes for the first three dates, but not for September 24, 2015 or December 18, 2015. Dr. Dawood's office visit notes in the record do not indicate findings on examination consistent with Plaintiff's complaints of severe low back pain. On November 20, 2014, Plaintiff appeared to be in no acute distress,

her range of motion was intact in the extremities, but decreased in the spine, and she had a normal gait. AR 478. The physical examination findings on February 17, 2015 were the same. AR 464. Dr. Dawood's physical examination findings on May 20, 2015 were extremely limited. She noted only that Plaintiff appeared to be in no apparent distress. AR 564. There is no indication that Dr. Dawood reviewed Plaintiff's other medical records. It appears, instead, that she relied on medical history provided by Plaintiff.

The medical records from other providers demonstrate that Plaintiff had a significant degenerative disc condition, particularly at L3-4, and that she complained of severe low back pain, and occasionally had radiating symptoms into the leg. Physical examination findings during her medical appointments were generally within normal limits, however, and her reported pain during examinations was usually mild or moderate. *See* Dr. Otten's March 19, 2013 and June 3, 2014 reports. AR 275-277; Dr. Meli's reports on January 28, 2014, March 28, 2014, AR 357-359, 354-356; Dr. Bady's reports on June 9, 2014. AR 271-272; and Dr. Cash's September 24, 2014 report. AR 326-327. Plaintiff's 2015 physical therapy records indicate that there was some improvement in her condition by April 9, 2015. AR 578-585. She then missed a month of therapy and reported increased pain in mid-May 2015. At the end of May 2015, she again indicated that she felt better with therapy. AR 575. In June 2015, she reported increased symptoms after missing therapy. She stopped appearing for therapy sessions in July 2015.

Although the ALJ's criticism of Dr. Dawood's opinion was brief, he provided sufficient specific and legitimate reasons for rejecting her opinion. Dr. Dawood's opinion was not, in fact, supported by her own clinical findings and there is no indication that she reviewed Plaintiff's other treatment records. Although Dr. Dawood reportedly saw Plaintiff on five occasions in 2015, only three of her office visit notes are contained in the record. The records and reports of other physicians who examined Plaintiff in 2014 and 2015, as well as the physical therapy records, do not support a finding of significant physical limitations due to severe pain. The ALJ, therefore, did not err in according greater weight to the opinion of Dr. Tella, who found that Plaintiff had the residual functional capacity to perform light work, notwithstanding that she had some limitations due to back pain.

20

**IV.    Whether the ALJ Erred in Failing to Set Forth Parameters of the Sit-and-Stand Alternative.**

Plaintiff argues that the ALJ erred by failing to set forth specific parameters in the hypothetical presented to the vocational expert regarding the requirement that Plaintiff be able to alternate between sitting and standing to relieve pain and discomfort.  Plaintiff argues that because the ALJ did not specify how long Plaintiff can sit without interruption, the vocational expert's testimony had no evidentiary value.  Defendant argues that the sit-stand alternative was not vague.  She also argues that Plaintiff's counsel should have clarified this requirement during the hearing if she believed it was vague.

Social Security Rule 96-9p states that in order to perform the full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8 hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals.  If an individual is unable to sit for a total of 6 hours in an 8-hour day, the *unskilled* sedentary occupational base will be eroded.  SSR 96-9p, 1996 WL 374185, at *6.  SSR 96-9p also states:

> An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically.  Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational basis for the full range of unskilled work will be eroded.  The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand.  The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing.  It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work.

*Id.* at *7.

In *Buckner-Larkin v. Astrue*, 450 Fed.Appx. 626, 627 (9th Cir. Sept. 20, 2011) (unpublished decision), the court stated that a sit-stand option in an RFC determination "is most reasonably interpreted as sitting or standing 'at-will.'" Other decisions do not require the ALJ to describe with specificity the scope of a sit-stand option.  *McDaniel v. Colvin*, 2017 WL 1399629, at *4-5 (C.D.Cal. Apr. 18, 2017) (discussing cases).  In *Dikov v. Social Security Administration*,

2014 WL 6085842, at * (D.Or. Nov. 13, 2014), the court distinguished between a sit-stand

*alternative* and a sit-stand *option* as follows:

> Due to painful conditions, some social security claimants are unable to sit or
> stand for long periods of time.  S.S.R.96–9P, *available at* 1996 WL374185, at
> *7 (1996).  "Where this need cannot be accommodated by scheduled breaks
> and a lunch period, the occupational base for a full range of unskilled
> sedentary work will be eroded." *Id.*  When this is the case, the ALJ must
> prompt the VE to identify vocations in which would accommodate an
> employee who must periodically alternate between a sitting and standing
> position. *Id.*  When the ALJ includes a sit-stand alternative in the RFC, the
> ALJ "must be specific as to the frequency of the individual's need to alternate
> sitting and standing." *Id.*

> But the ALJ in this case specified that Claimant have a sit-stand *option,* not a
> sit-stand *alternative.*  Review of the law surrounding this issue reveals that,
> while similar, a sit-stand alternative is a concept distinct from a sit-stand
> option, In *Larkin v. Astrue,* the Ninth Circuit reasoned that a "sit-stand option
> ... is most reasonably interpreted as sitting or standing 'at will.'" 450 Fed.
> Appx. 626, 627 (9th Cir.2011).  Similarly, courts in this district have rejected
> arguments similar to that now advanced by Claimant and held that, "common
> sense dictates that a 'sit/stand option' means exactly what it says; [the
> claimant] must have the option to either sit or stand at work.  This is consistent
> with a requirement that [the clamant] have the ability to 'sit or stand at will.'"
> *Swofford v. Comm'r Soc. Sec. Admin.,* No. 3:12–cv–00557–MA, 2013 WL
> 3333063, at *6 (D.Or. July 1, 2013); *See also Rowland v. Colvin,* 3:12–cv–
> 00549–HU, 2013 WL 5330611, at *10 (D.Or. Sept. 3, 2013) (coming to the
> same conclusion as the *Swofford* court.), Thus, according to those courts,
> because a claimant with a sit-stand option must be able to alternate between
> sitting and standing at will, it is a separate and distinct concept from the sit-
> stand alternative, the temporal parameters of which the ALJ must specifically
> define in the RFC.

The court further explained:

> The language of Social Security Ruling 83–12 supports the Ninth Circuit's
> interpretation of "sit-stand option." Following a brief discussion regarding the
> definition of the "alternate sitting and standing" requirement, the S.S.R.
> explains:

> > There are some jobs in the national economy—typically professional and
> > managerial ones—in which a person can sit or stand with a degree of
> > choice. If an individual had such a job and is still capable of performing
> > it, or is capable of transferring work skills to such jobs, he or she would
> > not be found disabled.  However, most jobs have ongoing work
> > processes which demand that a worker be in a certain place or posture
> > for at least a certain length of time to accomplish a certain task.

22

> Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to stand, a VS should be consulted to clarify the implications for the occupational base.

S.S.R. 83–12, *available at* 1983 WL 312523, at *4 (1983).

S.S.R. 83–12 recognizes that some vocations will allow a worker to sit or stand "with some degree of choice," and urges the ALJ to consult a VE to clarify the implications of a sit-stand alternative and determine whether specified jobs will accommodate such a limitation. *Id.* The key language in the above-quoted excerpt, which corresponds to the *Swofford* court's definition of sit-stand option is "a degree of choice." *Id.* A sit-stand option, as contemplated by the *Swofford* court and the ALJ in this case, is a sit-stand alternative under which the employee has an unlimited "degree of choice" regarding the position in which he or she works. When the ALJ included a sit-stand option in Claimant's RFC, he concluded that Claimant could work only those jobs which allowed an employee to freely choose his or her working posture, and did not "demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task." *Id.* at *4. Therefore, the ALJ did not err by failing to define the bounds of Claimant's sit-stand alternative because, by requiring positions with a sit-stand option, he determined that the bounds of Claimant's sit-stand alternative be limited only by Claimant's own discretion. Thus, the court concludes that the ALJ did not commit prejudicial error in this respect.

In this case, the ALJ stated that the hypothetical individual "must periodically alternate sitting and standing to relieve pain and discomfort." AR 60. At first blush, the ALJ's use of the word "alternate" would indicate that further specificity was required. The ALJ, however, asked the vocational expert whether an individual with this and the other limitations set forth in the hypothetical question, would be able to perform Plaintiff's past work as a controller and administrative assistant. Both of those are skilled positions with some managerial responsibilities and they would not appear to require the worker to be in a certain place or posture for a certain length of time to accomplish a certain task. *See* Dictionary of Occupational Titles ("DOT") Sections 160.167-058 and 169.167-010. It, therefore, appears that SSR 83-12 is the more apt reference under the circumstances of this case. The vocational expert testified that the individual would be able to perform these jobs. It is reasonable to infer that she opined that a sitting-standing alternative that allowed the individual to sit or stand at will was compatible with these specific jobs. It is noteworthy that the vocational expert did not state that the individual

could perform the Tele-Sales Representative job which is light work and does not involve managerial responsibilities.[1]  The ALJ did not err, therefore, in failing to provide a more specific description of the sit-stand alternative.  Accordingly,

### ORDER

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Reversal and/or Remand (ECF No. 12) is **denied**, and that the Defendant's Cross-Motion to Affirm (ECF No. 17) is **granted**.

Dated this 24th day of April, 2019.

**GEORGE FOLEY, JR.**
**UNITED STATES MAGISTRATE JUDGE**

---

[1] The ALJ erroneously stated that the vocational expert testified that an individual with Plaintiff's residual functional capacity could work as a tele-sales representative.  AR 21.  The ALJ's error was, however, harmless given that he was correct in concluding that Plaintiff was able to perform her other previous jobs.